**IN THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF MISSOURI WESTERN DIVISION**

| | | |
|---|---|---|
| NORFOLK SOUTHERN RAILWAY COMPANY,<br><br>Plaintiff,<br><br>v.<br><br>THE MAYOR, COUNCILMEN, and CITIZENS OF THE CITY OF LIBERTY,<br><br>Defendants. | ) | No. 4:25-CV-00064-DGK |

**ORDER GRANTING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

This lawsuit arises from Plaintiff Norfolk Southern Railway Company's ("Norfolk") claim that Defendant the city of Liberty, Missouri ("the City"), entered into an agreement ("the Crossing Agreement") with Norfolk's predecessor allowing the City to construct and use a private grade crossing across the railroad's tracks. In return, the City agreed to indemnify the railroad for any injuries arising from the crossing's use. In 2018, an accident occurred at the crossing, leaving one person dead and another seriously injured.

Two lawsuits arose from this accident (collectively, "the Underlying Actions"). Norfolk contends that after initially agreeing to indemnify Norfolk, once the City learned indemnification might exceed its insurance limits, the City refused to indemnify Norfolk, arguing the Crossing Agreement was invalid.

Now before the Court are Defendants' Motion for Summary Judgment, ECF No. 115, and Plaintiff's Motion for Partial Summary Judgment, ECF No. 118. Because Norfolk has demonstrated the Crossing Agreement is valid and it is entitled to summary judgment on its breach of contract claims, Norfolk's motion is GRANTED and Defendants' motion is DENIED.

## Summary Judgment Standard

Summary judgment is appropriate if, viewing all facts in the light most favorable to the nonmoving party, there is no genuine dispute as to any material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). Material facts are those facts "that might affect the outcome of the suit under the governing law," and a genuine dispute over material facts is one "such that a reasonable jury could return a verdict for the nonmoving part[ies]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The party seeking summary judgment bears the burden of showing a lack of a genuine dispute as to any material fact, *Celotex Corp.*, 477 U.S. at 323, and the Court views the facts in the light most favorable to the nonmoving party, drawing all reasonable inferences in that party's favor, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 588–89 (1986). To survive a motion for summary judgment, the nonmoving party must substantiate her allegations with "sufficient probative evidence that would permit a finding in her favor based on more than mere speculation, conjecture, or fantasy." *Mann v. Yarnell*, 497 F.3d 822, 825 (8th Cir. 2007) (quotation omitted).

## Undisputed Material Facts

The undisputed material facts are as follows. The Court has limited the facts to those that are undisputed and material to the pending summary judgment motion. *See* Fed. R. Civ. P. 56(c); L.R. 56.1(a). The Court has excluded legal conclusions, argument presented as fact, proposed facts not properly controverted, and proposed facts not properly presented or properly supported by the record or admissible evidence.[1] *See* Fed. R. Civ. P. 56(c); L.R. 56.1(a).

[1] For example, as discussed in a separate order, testimony from Curtis Renno is not admissible because the City violated Federal Rules of Civil Procedure 26(a) and 26(e) by failing to timely disclose him as a witness.

### A. Background of the Crossing Agreement.

The City is a municipal corporation organized and existing under the laws of the State of Missouri. On or about December 12, 1963, the City's Engineer, Frank E. Kirk ("Kirk"), contacted Norfolk's predecessor-in-interest, the Wabash Railroad ("Wabash"), to request "a private road crossing over the Wabash Railroad south of Liberty." Kirk stated that the City had purchased 27 acres south of the Wabash tracks intended for use as "a sewage treatment lagoon." The letter suggested the request for a crossing was urgent, and that failure to reach an agreement with Wabash to install and use a crossing would be costly and time-consuming to the City.

On December 19, 1963, Kirk sent another letter to Wabash enclosing a sketch of the approximate location of the requested private road crossing. According to Kirk, "The City of Liberty will construct the roadway, build the necessary drainage structures, and build and maintain gates in the location as shown. Additional barriers will be constructed to prevent access other than through the gate." Kirk also explained that the City's consultant, Larkin and Associates, would include construction of the crossing in the contract plans for the City's sewage lagoon.

On January 29, 1964, Kirk sent Wabash a copy of plans prepared by the City's consultant for the crossing. Kirk added a note to the plans indicating that "the construction of the track crossing . . . will be done by the Wabash at the expense of the City."

### B. The Liberty City Council approved the Crossing Agreement.

On February 7, 1964, the Liberty City Council met for a regularly scheduled meeting. City of Liberty Mayor Arthur B. Preston ("Mayor Preston") presided over the meeting at which Liberty City Clerk Shelby Morrow was present. The charter for the City in effect on that date authorized the City to "contract and be contracted with."

Kirk, the City's councilmen, the City's Treasurer, the City attorney, and others were

present for the city council meeting. At the council meeting, the Crossing Agreement, ECF No. 119-6, was presented to the Council for review and consideration. The Liberty City Council approved the Crossing Agreement by a vote of five to zero. This approval is memorialized in the Minutes as follows: "Agee moved Bell seconded to approve contract with Wabash Railroad for a crossing to Lagoon Site on Mann Farm. Motion carried 5 yeas no nays." ECF No. 119-5. The Minutes and Resolution were signed by Mayor Preston and attested to by Clerk Morrow.

Mayor Preston signed the Crossing Agreement that same day. He signed as "Mayor" for "City of Liberty" under the last paragraph in the Crossing Agreement, which reads in relevant part, ". . . the parties hereto have caused this agreement to be executed by their respective proper officers thereunto duly authorized . . ." Clerk Morrow attested the Agreement and Mayor Preston's signature on it. Also, that same day, D.E. Brummitt executed the Crossing Agreement on behalf of Wabash.

**C. The Ranes declaration does not create a genuine issue of material fact as to whether the Liberty City Council approved the Crossing Agreement.**

The City attached to its motion for summary judgment a declaration by Sarah Ranes executed on April 17, 2026, the day the City filed its motion for summary judgment. Ranes Decl., ECF No. 116-1 at 20. For two years, Ranes has served as the current Deputy City Clerk and the City's custodian of records for permanent records such as ordinances, resolutions, minutes, and contracts. *Id.* ¶ 2. In the declaration, Ranes claims she is "familiar with all the Permanent Records, how Permanent Records were created over the years, and how the City has maintained Permanent Records." *Id.* ¶ 3. She describes the City's *current* process for approving contracts and how the City now permanently stores records of these approvals. *Id.* ¶¶ 4–6. She states she searched the City's permanent records for a copy of the Crossing Agreement and any ordinance or resolution authorizing it and could not find any. *Id.* ¶ 7. Ranes concludes that because she could

not find any records authorizing the Crossing Agreement, it was never authorized by the City Council. *Id*. She notes, however, that she found a copy of the City Council meeting minutes recording the 5-0 vote approving it. *Id*. ¶ 8.

The problem with Ranes's declaration is that it is flatly contradicted by more trustworthy testimony previously given by Ranes. The first is deposition testimony Ranes gave as the City's corporate representative on August 28, 2025. During this deposition, Ranes testified that she did not know whether the record-generating and recordkeeping process used in 1964 was any different than the one used now because she does not know what the process used was then. Ranes Dep. at 16-18, ECF No. 128-1. She also testified she did not know if the City has any information or knowledge about the recordkeeping practices used in 1964, and that the City did not have anything that would let her answer about the record-generating and recordkeeping process used in 1964. *Id*. at 17.

The second piece of contradictory testimony is Ranes's verification of the City's Supplemental Response to Plaintiff's Second Interrogatories, which she verified on March 4, 2026. These supplemental responses concerned how the City belatedly came to find and produce a box containing several historical letters discussing the Crossing Agreement.[2] ECF No. 134-10. The Supplemental Response stated the letters were

> discovered by the City in a box of unrelated, random documents at City Hall before being produced in this case. The City had no idea that Exhibit A was at City Hall at the time of its discovery. Exhibit A was not at City Hall intentionally. Exhibit A was not at City Hall as part of the City's regular activities. Exhibit A was not stored or archived by the City. Exhibit A was not maintained by the City.

[2] When it initially produced this box of documents, the City refused to provide any explanation about where or how they were discovered, or why they were not found earlier. This lack of explanation prompted Norfolk to serve a second round of interrogatories aimed at just this box of documents. After the City provided answers Norfolk viewed as purposefully evasive and untrue, a discovery dispute ensued. After briefing, the Court held the City's response was "woefully insufficient, so deficient that it appears to be purposefully insufficient." Order Regarding Disc. Dispute at 6, ECF No. 104. The City then provided the Supplemental Response which Ranes verified.

> There was no custodian of Exhibit A at the City. The City does not know how Exhibit A came to be at City Hall.

Supplemental Resp. at 2–3.

To make matters worse, the City has provided no explanation for the earlier, contradictory testimony provided by Ranes.

Given this record, the Court completely discounts the summary judgment declaration as a matter of law. It is well settled that the Court may discount as a matter of law an affidavit given by a witness that contradicts the witness's earlier testimony given under oath where the witness offers no explanation for the inconsistencies. *Stewart v. Rise, Inc.*, 791 F.3d 849, 861 (8th Cir. 2015); *Frevert v. Ford Motor Co.*, 614 F.3d 466, 474 (8th Cir. 2010) (noting a party cannot "create a genuine issue of material fact simply by submitting an affidavit that contradict[s] testimony at a prior deposition, where there were no legitimate reasons for the filing of an inconsistent affidavit."). The Court concludes from Ranes's deposition testimony and verification of the supplemental responses that her knowledge of the City's recordkeeping related to historical documents is unreliable. It appears the City randomly stores, loses, and finds historical documents, particularly those that might be adverse to its present litigation interests. This negates Ranes's claim in the declaration that the fact that she could not find any records authorizing the Crossing Agreement means it was never authorized by the City Council. The Court holds the City's recordkeeping related to historical records is sufficiently flawed that no inference adverse to Norfolk can be drawn from the fact that the City did not find records other than the meeting minutes.

**D. The Crossing Agreement included an indemnification provision.**

The Crossing Agreement applies to a railway-highway grade crossing ("the Crossing") currently identified under the Federal Railroad Administration's Highway-Grade Crossing

Inventory as crossing number 483881W, sometimes referred to as the Liberty Bend Crossing. The accident giving rise to the Underlying Lawsuits occurred at the Crossing.

The Crossing Agreement contains numerous provisions.[3] The provision at issue in this lawsuit relates to indemnification. This provision states:

> As a part of the consideration for the grant herein made to it by the Wabash the City assumes the risk of, and covenants and agrees that it will save harmless the Wabash from and indemnify it against, any and all losses, damages, recoveries, costs and expenses for injury to or death of any person or persons whomsoever, or loss or destruction of, or damage to any property whatsoever (including both parties hereto and their employees and property, lessees and licensees) arising from or growing out of, directly or indirectly, the construction, use, existence, operation or maintenance of the roadway, private crossing or pipe line on the property of the Wabash or removal thereof, whether caused by the negligence of the Wabash, its agents, employees, servants or otherwise.

*Id*. at ¶ Tenth.

**E. Events after the making of the Crossing Agreement.**

On September 25, 1964, Engineer Kirk sent a letter to Wabash requesting "that the private crossing, to serve our sewage lagoon, be constructed as soon as possible. It will be necessary that this crossing be constructed before construction can start on the lagoon." Letter dated Sept. 25, 1964, ECF No. 119-12. Wabash subsequently constructed the Crossing.

---

[3] Under the Crossing Agreement, the City obtained "the right to construct and use a 15 foot roadway, private crossing, and underground 24 inch corrugated pipe" subject to the conditions contained therein "solely for the purposes of ingress and egress to the City's sewage treatment lagoon." Crossing Agreement ¶ Witnesseth, Sixth. Additionally:

a. The Wabash would provide the labor and materials, and install and thereafter maintain, a 12-foot private crossing at crossing location.

b. The City would construct the approaches to the crossing "at its sole cost, risk and expense" in accordance with certain Wabash specifications.

c. After construction, the City would "maintain and renew the approaches to [the] private grade crossing, at its sole cost, risk and expense . . ." in accordance with certain Wabash specifications.

d. The City would "construct and thereafter maintain all drainage structures necessitated by reason of the construction of the approaches to [the] private crossing" at the City's sole cost, risk and expense."

e. Wabash reserved the right to make changes to the tracks.

*Id*. ¶¶ One–Fourth, Sixth, Ninth.

On June 7, 1965, Wabash's successor, Norfolk & Western Railway Company ("N&W"), sent a letter to Kirk that stated in part: "As you know, a private crossing has been installed across the Norfolk and Western tracks at South Liberty, Missouri to provide access to the sewage lagoon recently constructed." Letter dated June 7, 1965, ECF No. 119-13. The letter requested that the City install the gates to the approaches to the crossing as required by the Agreement.

On June 11, 1965, Kirk responded by stating, "we have notified the contractor employed by the City to proceed with construction of the gates. . . . The City of Liberty will be the only users of this access after construction is completed . . . . It is our intention to maintain and operate the gates as outlined in our agreement with the Wabash." Letter dated June 11, 1965, ECF No. 119-14.

At some point between 1990 and 1996, Wabash (or its successor, N&W) constructed a second set of railroad tracks parallel to the original set of tracks at the Crossing.

Wabash merged with N&W effective November 12, 1991. In this merger, N&W acquired all of Wabash's assets and liabilities, including Wabash's rights in the Crossing Agreement. N&W merged into Norfolk effective September 1, 1998, acquiring all of N&W's assets and liabilities, including its rights in the Crossing Agreement.

On September 26, 2018, a tragic accident occurred at the Crossing in which one of the City's employees, Cameron Leeds, accidentally drove a city truck into the path of an oncoming train. Mr. Leeds died in the accident and another City employee riding in the truck with him, Thomas Shadid, was injured. Sometime after the accident, the City stopped using the Crossing and barricaded access to it.

On July 12, 2019, Alexandra Leeds filed a wrongful death suit in the Circuit Court of Clay County, Missouri, against Norfolk and two of its employees ("the Leeds Action"). The lawsuit

alleged, among other things, that Norfolk negligently caused Mr. Leeds's death.

On December 20, 2019, Norfolk tendered the Leeds Action to the City and its insurer, Midwest Public Risk of Missouri ("MPR"), pursuant to the Crossing Agreement. MPR accepted the defense. On February 4, 2020, an attorney for the City and MPR sent a letter confirming their acceptance of Norfolk's tender of defense and demand for indemnity in the Leeds Action.

On September 19, 2023, Shadid filed suit against Norfolk and two of its employees in the Circuit Court of Clay County, Missouri, seeking damages for injuries he sustained in the accident (the "Shadid Action"). On October 11, 2023, Norfolk tendered the Shadid Action to the City and MPR pursuant to the Crossing Agreement. MPR accepted Norfolk's tender and assumed Norfolk's defense of the Shadid Action.

On October 16, 2023, an attorney representing the City sent a letter to Norfolk confirming that the City was terminating the Crossing Agreement and closing the Crossing. It stated:

> As you obviously know, I represent the City of Liberty, Missouri, and I have been working with Brian Goldstein to take steps to terminate the Private Crossing Agreement between Liberty and Norfolk Southern Railway. Liberty no longer needs the crossing, as it has other access to its property. The City of Liberty has concluded it would be in the public interest and best for public safety that the crossing be terminated. Let me know what we need to do to confirm the termination of this Private Crossing Agreement.

Letter dated Oct. 16, 2023, ECF No. 119-18.

In late 2024, as the trial date in the Leeds Action was approaching, Norfolk notified the City that its potential liability under its indemnity obligation could exceed the limits of the City's available insurance. The City then began looking at whether the Crossing Agreement might be invalid or unenforceable.

On December 18, 2024, the City's attorneys announced that "the original contract with the

Wabash Railroad dated February 7, 1964, was not properly authorized by an ordinance or resolution of the Liberty City Council and was therefore, not properly executed by the then Mayor, Arthur Preston." Letter dated Dec. 18, 2024, at 1, ECF No. 119-25. Thus, for this and other reasons, the City would "not agree to voluntarily contribute City of Liberty resources beyond the workers' compensation benefits previously paid to settle the claims of the Leeds family and Thomas Shadid." *Id.* at 2.

On or about January 17, 2025, Norfolk settled the Leeds Action for $[redacted]. The amount paid to settle was reasonable based upon the facts of the case and the potential exposure Norfolk faced if it went to trial. Norfolk paid $[redacted] of this amount; MPR paid the remaining amount with available limits of the City's insurance policy. MPR paid the majority of the attorneys' fees and litigation costs incurred to defend the Leeds Action. After the available insurance limits were exhausted, Norfolk was responsible for $[redacted] in legal fees. These amounts were reasonable and necessarily incurred in the defense of the Leeds Action.

On or about September 30, 2025, Norfolk settled the Shadid Action for $[redacted], a reasonable amount based upon the facts of the case and Norfolk's potential exposure if the case went to trial. Norfolk paid $[redacted] of the settlement; MPR paid the remaining amounts with the remaining limits of its insurance policy. MPR paid the majority of the attorneys' fees and litigation costs incurred to defend the Shadid Action. After the available insurance limits were exhausted, Norfolk was responsible for the remaining $[redacted] in legal fees, all of which were reasonable and necessarily incurred in its defense of the Shadid Action.

**Analysis**

Norfolk moves for summary judgment on Count I (breach of indemnity agreement/breach of contract for the Leeds Action) and Count II (breach of indemnity agreement/breach of contract

for the Shadid Action). The City cross moves for summary judgment in its favor on all counts. With respect to Counts I and II, the City argues the Crossing Agreement is invalid because it was never approved as required under Missouri law.

There are four elements to a breach of contract claim under Missouri law: (1) existence of a valid contract; (2) the plaintiff performed or tendered performance under the contract; (3) the defendant breached the contract; and (4) as a result, the plaintiff suffered damages. *Keveney v. Mo. Military Acad.*, 304 S.W.3d 98, 104 (Mo. 2010)). The rules applicable to the construction of contracts apply generally to indemnity agreements as well. *Union Elec. Co. v. Southwestern Bell Tel. L.P.*, 378 F.3d 781, 786 (8th Cir. 2004). The only element in dispute in this case is whether a valid contract existed; that is, whether the Crossing Agreement is valid and enforceable.

It is.

**A. The Crossing Agreement is valid and enforceable.**

The City argues the Crossing Agreement is void or unenforceable for four reasons: (1) no one from the City was "duly appointed and authorized" to enter into it, as required by Missouri Revised Statute § 432.070; (2) authority to enter into the Crossing Agreement was not made in a separate writing, as allegedly required by Missouri Revised Statute § 432.070; (3) Missouri Revised Statute § 70.230 required the Crossing Agreement be approved by a separate ordinance; and (4) even if the Crossing Agreement was valid, Norfolk materially altered the agreement when it constructed a second track at the crossing.

These arguments are all unavailing.

### 1. The Crossing Agreement complies with § 432.070.

Section 432.070 states:

> No county, city, town, village, school, township, school district or other municipal corporation shall make any contract, unless the same shall be within the scope of its powers or be expressly authorized by law, nor unless such contract be made upon a consideration wholly to be performed or executed subsequent to the making of the contract; and such contract, including the consideration, shall be in writing and dated when made, and shall be subscribed by the parties thereto, or their agents authorized by law and duly appointed and authorized in writing.

In essence, § 432.070 "requires that all contracts entered into by a city be in writing and that the authority for such contracts must also be in writing." *Moynihan v. City of Manchester*, 265 S.W.3d 350, 354 (Mo. Ct. App. 2008). The purpose of the statute is to prevent parties who have performed services for a municipality without a written, council-approved contract from later trying to recover the value of such services based upon implied contract theories. *Kindred v. City of Smithville*, 292 S.W.3d 420, 427 (Mo. Ct. App. 2009). A contract that fails to comply with § 432.070 is void at the outset, not merely voidable. *Moynihan*, 265 S.W.3d at 354. Compliance with § 432.070 "need not occur in any particular order, or even in a single document." *Pub. Water Supply Dist. No. 16 v. City of Buckner*, 44 S.W.3d 860, 864 (Mo. Ct. App. 2001). In some cases, substantial compliance with the statute may be sufficient. *Moynihan*, 265 S.W.3d at 354.

To show the Crossing Agreement complies with § 432.070, Norfolk must show: (1) a contract exists between the City and Norfolk (or its predecessor); (2) the contract was in writing and dated when it was made; (3) the contract was subscribed to by the parties to it or their agents authorized by law and duly appointed and authorized in writing; (4) the contract was within the scope of the municipality's powers or was expressly authorized by law; and (5) the contract was

made upon a consideration wholly to be performed or executed subsequent to the making of the contract. *See DeMarr v. Kansas City, School Dist.*, 802 S.W.2d 537, 541 (Mo. Ct. App. 1991).

The City's first argument is that no one from the City was "duly appointed and authorized" to enter into the Crossing Agreement. This argument is unavailing. The Crossing Agreement was made within the City's powers and expressly authorized by law. As the Court previously held in denying the City's motion to dismiss, "the City was acting under its *express* authority, both under Mo. Rev. Stat. § 250.010 and its charter, City of Liberty Charter, § 1 Incorporation (giving the City the power to 'contract and be contracted') to enter into the Crossing Agreement." Order at 10 (emphasis added), ECF No. 48.

The record developed during discovery confirms the Court's earlier ruling. The record shows that on February 7, 1964, the City Council held a regular council meeting where the City Council unanimously approved the Agreement, and the City entered it with Wabash. This approval was memorialized in the council meeting's minutes as follows: "Agee moved Bell seconded to approve contract with Wabash Railroad for a crossing to Lagoon Site on Mann Farm. Motion carried 5 yeas no nays." When Mayor Preston signed the Agreement, he expressly represented, warranted, and confirmed that he was one of the City's "proper officers" that had been "duly authorized" by the City to execute it on behalf of the City "as of the day and year first written above" (February 7, 1964). The Clerk's attestation of the Agreement constituted a separate affirmation that both she and Mayor Preston were duly and properly authorized to execute it. This demonstrates that the Mayor and the City Clerk were authorized by the City Council to enter the Crossing Agreement and that they did so. Because the City's action was recorded, signed by the Mayor, and attested to by the City Clerk, it constituted a written authorization to act for purposes of § 432.070.

The City's contention that the minutes do not satisfy § 432.070 because they are "too vague and uncertain," or that the contract referenced in the minutes could be some other agreement, are meritless. The minutes referencing approving a "contract with Wabash Railroad for a crossing to Lagoon Site," along with City Engineer Frank Kirk's correspondence with Wabash before and after the meeting about constructing a crossing to a sewage lagoon, confirm that the Crossing Agreement was the contract being approved. There is no evidence that the City contemplated entering into any other contract with Wabash around this time, much less one for a crossing to a sewage lagoon.

The City's second argument—that the Crossing Agreement is void under § 432.070 because the authority to enter into the Crossing Agreement would have to be made in a separate writing, and no such separate writing was made here—is also unavailing. As a threshold matter, the statute contains no such requirement. Section 432.070 "requires that all contracts entered into by a city be in writing and that the authority for such contracts must also be in writing," *Moynihan*, 265 S.W.3d at 354, but compliance with § 432.070 "need not occur . . . in a single document." *Buckner*, 44 S.W.3d at 864.

Even if the statute did contain such a requirement, a separate writing—the City Charter in effect at the time—authorized the City to enter contracts such as the Crossing Agreement. And on February 7, 1964, the City Council unanimously approved a separate document which was in writing, dated, and made upon consideration performed after the making of the contract, namely, the Crossing Agreement itself. The Mayor then executed the Crossing Agreement on behalf of the City, and D.E. Brummitt executed the Crossing Agreement on behalf of Wabash. Thus, all the requirements of § 432.070 were satisfied.

**2. Mo. Rev. Stat. §§ 70.220 and 70.230 do not apply to the Crossing Agreement.**

The City's third argument is that Mo. Rev. Stat. §§ 70.220 and 70.230 required the Crossing Agreement to be approved in a separately enacted ordinance. Since it was not approved by a separate ordinance, it is invalid.

Norfolk responds that §§ 70.220 and 70.230 are inapplicable to the Crossing Agreement because it is not a "cooperation agreement" as contemplated by these statues. Norfolk argues the Crossing Agreement is a purely private, non-cooperation agreement, and no Missouri court has ever applied these statutes to an agreement such as this one. It argues doing so would dramatically re-write Missouri municipal contract law by effectively eliminating the doctrine of substantial compliance with § 432.070.

The relevant portion of § 70.220 states:

> *Any municipality* or political subdivision of this state, as herein defined, *may contract and cooperate with . . . any private person, firm, association or corporation*, *for the planning, development, construction, acquisition or operation of any public improvement or facility, or for a common service*; provided, that the subject and purposes of any such contract or cooperative action made and entered into by such municipality or political subdivision shall be within the scope of the powers of such municipality or political subdivision.

Mo. Rev. Stat. § 70.220.1 (emphasis added). Additionally, § 70.230 provides:

> *Any municipality may exercise the power referred to in section 70.220 by ordinance duly enacted*, or, if a county, then by order of the county commission duly made and entered, or if other political subdivision, then by resolution of its governing body or officers made and entered in its journal or minutes of proceedings, *which shall provide the terms agreed upon by the contracting parties to such contract or cooperative action*.

Thus, in the context of this case, § 70.230 applies to the Crossing Agreement if it is (1) a "contract

and cooperate" agreement, (2) made between a municipality and a private company, for (3) the construction of "any public improvement."

The second requirement is obviously satisfied—the Crossing Agreement was made between a municipality and a private company—and the Court rules as follows with respect to the remaining two requirements. The first element is probably not satisfied. For the reasons set out in Norfolk's brief, the Crossing Agreement probably does not qualify as a "contract and cooperate" agreement as Missouri courts have viewed such agreements. The Court declines to answer this question definitively because doing so is unnecessary given that the third element is clearly not satisfied, that is, there was no construction of "any public improvement" here.

The word "public" means "open or available for all to use, share, or enjoy." *Public*, Black's Law Dictionary (10th ed. 2014). The Crossing Agreement gave the City "the right to construct and use a 15 foot roadway, private crossing, and underground 24 inch corrugated pipe" across the railroad's property that the railroad would build. The road, crossing, and pipe were all for the City's private and exclusive use. No member of the public could drive on the road, utilize the railroad crossing, or connect to the pipe, thus no member of the public, much less *all* of the public, could use, share, or enjoy these things. Granted, the City used the road, crossing, and pipe to reach what is arguably a public improvement—the sewage lagoon—but the road, crossing, and pipe were not themselves public improvements.

The City's argument that § 70.230 applies to the Crossing Agreement is underwhelming. Its entire argument is that

> the Contract was for acquisition of 'the right to construct and use a 15 foot roadway, private crossing, and underground 24 inch corrugated pipe' for access to a sewage lagoon site. It therefore *pertained* to the development, construction, and operation of a public improvement or facility with the ambit of § 70.220.

Defs.' Suggestions in Supp. of Mot. for Summ. J. at 19 (emphasis added), ECF No. 116; Defs.' Suggestions in Opp'n to Pl.'s Mot. for Summ. J. at 77 (same), ECF No. 129. As a threshold matter, the City does not develop or explain this argument, which is fatal. *See Economy Folding Box Corp. v. Anchor Frozen Foods Corp.*, 515 F.3d 718, 721 (7th Cir. 2008) ("It is not the court's responsibility to research the law and construct the parties' arguments for them."); *Gamez v. Colvin*, No. 13-4199-CV-W-DGK-SSA, 2014 WL 4112925, at *4 (W.D. Mo. Aug. 19, 2014) ("Because Plaintiff did not develop her argument sufficiently to guide the Court, it is rejected."); *see* Fed. R. Civ. P. 7(b)(1)(B) (requiring movants to "state with particularity the grounds for seeking the order").

Even if the Court were willing to flesh out the City's argument for it, it would not be persuasive. The City's argument seems to be that if something *pertains* to the development, construction, or operation of a public improvement or facility encompassed by § 70.220, then a contract to construct that something is also governed by § 70.220. This argument is unavailing, however, because the word "pertains" (or its equivalent) does not appear anywhere in the statute, and the Court is not empowered to re-write Missouri statutes to expand their reach.

Consequently, the Court holds §§ 70.220 and 70.230 do not apply to the Crossing Agreement.

**3. There is no admissible evidence that Norfolk materially altered the agreement.**

Fourth and finally, the City contends that even if the Crossing Agreement is valid, Norfolk materially altered it when it constructed a second track at the crossing. The City contends the Crossing Agreement provides indemnification only for losses arising out of the use of a crossing over a single railroad track. But the addition of the second track materially increased the risk of a train colliding with a vehicle. Since the City never agreed to the increased risk of liability

associated with the second set of tracks, Norfolk has materially altered it.

This argument rests on a factual premise that the second set of railroad tracks caused the accident at issue in the Underlying Actions, or at least materially increased the risk of such an accident. And this fact rests on the declaration of Curtis Renno. Defs.' Suggestions in Supp. of Mot. for Summ. J. at 19. The Court, however, has stricken his declaration because the City violated Federal Rules of Civil Procedure 26(a) and 26(e) by failing to disclose him as a witness. Order Granting Mot. to Strike Decl. at 5, ECF No. 157. As discussed in that order, this failure to disclose was not substantially justified or harmless, so the City cannot rely on his declaration in its motion for summary judgment, nor can it call him as a witness at trial or otherwise use his testimony. Consequently, there is no admissible evidence in the record that Norfolk materially altered the Crossing Agreement.

In conclusion, the Court holds Norfolk has demonstrated that the Crossing Agreement is a valid and enforceable contract, the first element of its breach of contract claim.

**B. Norfolk has proven the three other elements of its breach of contract claims.**

The three remaining elements of Norfolk's breach of contract claims are: (1) Norfolk performed or tendered performance under the contract; (2) the City breached the contract; and (3) Norfolk suffered damages. *Keveney*, 304 S.W.3d at 104. The Court holds ample evidence on the record demonstrates these three elements are satisfied and Norfolk is entitled to summary judgment as a matter of law.

First, Norfolk performed its obligations under the Crossing Agreement. Norfolk's obligation was to construct and maintain the Crossing and allow the City to use it. The record shows that by June 7, 1965, the private crossing had been installed, Norfolk continued to maintain it, and the City was allowed to use it for more than fifty years until the City terminated the Crossing

Agreement and closed the Crossing in 2023.

Second, the City breached its indemnity obligation under the Crossing Agreement. In the Crossing Agreement, the City agreed to indemnify Wabash "against, any and all losses, damages, recoveries, costs and expenses for injury to or death of any person or persons . . . arising or growing out of . . . the construction, use, existence, operation or maintenance of the roadway, private crossing or pipe line on the property of the Wabash . . . whether caused by the negligence of the Wabash . . . or otherwise." The September 26, 2018, accident occurred at the Crossing and therefore arose or grew out of the use or existence of the crossing. Thus, the City was obligated to indemnify Norfolk with respect to the claims in the Underlying Actions.

Norfolk gave the City timely notice of the Underlying Actions. After initially agreeing to indemnify Norfolk, the City subsequently reversed course and repudiated its indemnity obligations by refusing to pay any money to indemnify Norfolk. Thus, the City breached its indemnity obligations as a matter of law.

Third, Norfolk suffered damages because of the City's breach. The record shows Norfolk negotiated a reasonable settlement of the Leeds Action for $[redacted]. Norfolk paid $[redacted] of this amount and $[redacted] in legal fees reasonably and necessarily incurred in its defense of the case. The City's insurer, MPR, paid the balance. Thus, Norfolk suffered damages of $[redacted] for the City's breach of the Crossing Agreement's indemnification provision with respect to the Leeds Action, Count I.

Norfolk also negotiated a reasonable settlement of the Shadid Action for $[redacted], of which Norfolk paid $[redacted] and $[redacted] in legal fees which were reasonably and necessarily incurred. Thus, Norfolk suffered damages of $[redacted] for the City's breach of the Crossing Agreement's indemnification provision with respect to the Shadid Action, Count II.

Norfolk's damages for both counts total $[redacted].

## Conclusion

For the reasons discussed above, Norfolk has demonstrated it is entitled to summary judgment on Counts I and II. Norfolk's motion is GRANTED and Defendants' motion is DENIED.

**IT IS SO ORDERED.**

Date: September 21, 2026

/s/ Greg Kays
GREG KAYS, JUDGE
UNITED STATES DISTRICT COURT